OPINION.
{¶ 1} Plaintiff-appellant, BI Properties, Inc. ("BI"), appeals the summary judgment granted in favor of defendant-appellee, Vulcan Blanchester Realty Corporation ("Vulcan"), in a suit alleging breach of a fiduciary duty. For the following reasons, we affirm the trial court's judgment.
 {¶ 2} In 1993, BI and Vulcan began negotiations to form a partnership for the purpose of purchasing the Cincinnati Club Building. They ultimately executed an agreement pursuant to which the Cincinnati Club Building Associates ("CCBA") partnership was created. Pursuant to the partnership agreement, the ownership shares of BI and Vulcan were determined based upon the ratio of each party's investment. At the time the partnership purchased the building, BI had invested $31,667, and Vulcan had invested $1,240,000, rendering an investment ratio of 2.49% for BI and 97.51% for Vulcan.
 {¶ 3} The partnership agreement included a clause that permitted BI to invest an additional $1,201,667 so that it could increase its share in the partnership to 45.24%. In 1997, BI proposed that it increase its share in CCBA to 45.24% with a payment of $600,000. That proposal also included an amendment to the partnership agreement's buyout provisions. Vulcan ultimately rejected the proposal, and when BI proposed the same arrangement in 1998, Vulcan again rejected it.
 {¶ 4} At the time CCBA purchased the building, Davis Catering occupied three of the building's floors. CCBA entered into an agreement pursuant to which Davis Catering, in the form of a company named Dawson Realty ("Dawson"), would purchase the three floors it already occupied. To facilitate the transaction, CCBA financed Dawson's purchase of the floors, with Dawson delivering a $900,000 promissory note and mortgage to CCBA.
 {¶ 5} Under the terms of the note, Dawson was to pay CCBA $10,000 per month. Under a separate agreement, Dawson was to pay a monthly amount to CCBA for maintaining Dawson's portion of the building and for other operating expenses. Vulcan, through its employee John Gabriel, assumed the duties of maintaining the building and otherwise supervising its day-to-day operations.
 {¶ 6} Dawson was able to make the monthly payments on the note regularly through 1998, but soon after entering into the maintenance agreement, it fell behind on its obligation to CCBA for the operating expenses. By 1998, its arrearage on the operating expenses was approximately $160,000. Gabriel and Vulcan's president, Benjamin Gettler, began to put increased pressure on Dawson to erase the arrearage.
 {¶ 7} In early 1998, Dawson informed Vulcan of its intention to obtain additional financing. According to Gettler and Gabriel, Vulcan was under the impression that Dawson was seeking financing only for the arrearage on the operating expenses, and not for the balance of the $900,000 note. According to Gettler and Gabriel, the only indication that Dawson had been seeking to refinance the note was an inquiry on behalf of Dawson asking Vulcan to refinance the note, a request that Vulcan had declined. There was no evidence that Dawson indicated to Vulcan its intention to seek institutional financing as a result of Vulcan's refusal to refinance the note.
 {¶ 8} Gettler testified in his deposition that Vulcan had complied with requests from Key Bank for financial information relating to Dawson's loan, but that the requests from Key Bank did not indicate that Dawson was seeking any greater sum than the expense arrearage. Similarly, he testified that Vulcan had offered to guarantee the Key Bank loan so that Dawson could receive a lower interest rate, but that the offer of the guarantee had been premised on the loan being for the operating expenses only.
 {¶ 9} On July 21, 1998, Dawson closed on its loan from Key Bank. On the date of the closing, two checks were tendered to CCBA, one for the operating-expense arrearage, and one for the balance of the $900,000 promissory note. On August 21, 1998, CCBA issued approximately $800,000 to Vulcan and $22,137.05 to BI, as the partners' respective shares of the Dawson payments. The undisputed evidence was that BI had not been informed of Dawson's prepayment of the promissory note until CCBA had distributed the funds at the August 21, 1998, meeting.
 {¶ 10} In 1999, BI filed suit against Vulcan, alleging that it had breached its fiduciary duty by failing to inform BI that Dawson had intended to refinance the $900,000 note. According to the complaint, Vulcan's failure to inform BI of the refinancing had deprived BI of the opportunity to increase its ownership share in CCBA and thereby to reap a greater proportion of the prepayment of the note. Vulcan denied any knowledge of Dawson's intention to refinance the note, arguing that it had been alerted only to Dawson's plan to finance the operating-expense arrearage. After extensive discovery, Vulcan filed a motion for summary judgment, which the trial court granted.
 {¶ 11} In a single assignment of error, BI now argues that the trial court erred in granting Vulcan's motion for summary judgment. Specifically, BI contends that there was a genuine issue of material fact concerning Vulcan's knowledge about Dawson's intention to refinance the promissory note.
 {¶ 12} Pursuant to Civ.R. 56(C), a motion for summary judgment may be granted only when no genuine issue of material fact remains to be litigated, the moving party is entitled to judgment as a matter of law, and it appears from the evidence that reasonable minds can come to but one conclusion, and, with the evidence construed most strongly in favor of the nonmoving party, that conclusion is adverse to that party.[1] The party moving for summary judgment bears the initial burden of demonstrating that no genuine issue of material fact exists, and once it has satisfied its burden, the nonmoving party has a reciprocal burden to set forth specific facts showing that there is a genuine issue for trial.[2] This court reviews the granting of summary judgment de novo.[3]
 {¶ 13} A fiduciary relationship exists between business partners and imposes on them the duty to exercise the utmost good faith and honesty in transactions relating to the partnership.[4] Here, Vulcan concedes that it would have had a duty to disclose any impending plan on the part of Dawson to repay the $900,000 promissory note through an institutional loan, but it argues that BI failed to demonstrate that Vulcan was aware of Dawson's plan to refinance the note.
 {¶ 14} We agree with Vulcan that BI failed to meet its burden of demonstrating Vulcan's knowledge. Both Gabriel and Gettler testified that all Vulcan's communications with Dawson concerning institutional financing related only to the operating-expense arrearage. They testified that the only inquiry with respect to the $900,000 note had been Dawson's request that Vulcan itself refinance the loan, a request that Vulcan had declined.
 {¶ 15} Robert Dawson, one of the partners of Dawson Realty, similarly testified in his two depositions that his discussions with Gettler and Gabriel about bank financing concerned only the operating expenses. BI argues that Robert Dawson's testimony in his first deposition bolstered its claim that Vulcan was aware that Dawson Realty intended to refinance the note. We disagree. Though the portions of the testimony that BI cites may have seemed to imply such knowledge, the context of the testimony indicated that Robert Dawson was referring only to the operating expenses. The testimony in the second deposition, and Robert Dawson's statements in an affidavit, merely confirmed that conclusion. Thus, any attempt on the part of BI to base its claim of a genuine issue of fact on the alleged inconsistencies among Robert Dawson's statements must fail.
 {¶ 16} Bruce Sholk, the secretary of BI, was unable to identify any factual basis for his belief that Vulcan was aware of Dawson's intentions. In his deposition, Sholk merely stated in general terms that Vulcan must have been aware that Dawson was going to refinance the note. His testimony revealed that he had little involvement in the day-to-day operations of CCBA and did not have frequent communications with Vulcan or Dawson. This lack of direct involvement, coupled with the vagueness of his assertions, rendered Sholk's testimony wholly ineffectual in demonstrating that Vulcan had breached its fiduciary duty to BI.
 {¶ 17} BI, though, cites a number of circumstances surrounding Dawson's pursuit of financing as evidence of Vulcan's knowledge that Dawson had intended to prepay the promissory note. One such circumstance was Dawson's request that Vulcan itself refinance the promissory note. Although that request indicated that Dawson at some point had considered refinancing the note, it did not indicate that Dawson was seeking institutional financing or that such financing was imminent in 1998. As we have already noted, the other discussions among the representatives of Dawson and Vulcan concerned institutional financing for the operating expenses only.
 {¶ 18} BI also cites Dawson's request, prior to the July 21, 1998, closing, that Gabriel provide a letter showing the payoff amount on the note. We deem this to be of little consequence. As Gettler and Gabriel testified, Dawson had requested a number of financial and legal records in conjunction with what Vulcan believed to be the $160,000 loan. The requests concerning Dawson's other debts — including the payoff amount for the note — were certainly not inconsistent with Vulcan's asserted belief that Dawson was seeking to borrow only $160,000. In light of the testimony of Gettler, Gabriel, and Robert Dawson that they had discussed the financing of the operating expenses only, the bank's request for the payoff amount was not of such significance that knowledge of the prepayment could be attributed to Vulcan.
 {¶ 19} Similarly, Vulcan's insistence that Dawson remedy the operating-expense arrearage and Gabriel's offer to guarantee "the loan" did not indicate that Vulcan was aware of Dawson's intent to seek institutional financing for the note. If anything, Vulcan's increased displeasure with the expense arrearage indicated that it was concerned only with the $160,000 sum and not the payment of the promissory note, which reflected no such delinquency. The circumstances cited by BI, therefore, did not demonstrate that Vulcan had foreknowledge of the prepayment of the note.
 {¶ 20} Nonetheless, BI further argues that Vulcan's failure to inform BI of the payment of the note in the interim between July 21, 1998, and August 21, 1998, unequivocally demonstrated that Vulcan had breached its fiduciary duty. According to BI, the funds from the payment were not formally disbursed until the August 21 meeting. BI argues that, if it had known of the payment in the interval between July 21 and August 21, it could have tendered the additional capital that would have entitled it to a greater share of the Dawson payment.
 {¶ 21} We find no merit in this argument. Although the partnership agreement indicated that payments to the partners were not to be made until there had been a determination of what constituted "distributable net cash flow," the agreement did not indicate that the shares in the partnership could be altered to retroactively affect entitlement to funds that the partnership had received. The portions of the agreement that BI cites merely dictated the mechanics of distributing funds and were not intended to affect the structure of the ownership of CCBA. Vulcan's failure to inform BI of the Dawson payment prior to the August 21, 1998, meeting was therefore immaterial to the claim that Vulcan had breached its fiduciary duty.
 {¶ 22} Finally, BI suggests that, irrespective of Vulcan's knowledge concerning the prepayment of the note, Vulcan had breached its fiduciary duty by rejecting BI's efforts to purchase additional equity in the partnership. This argument is without merit. As Vulcan notes, BI did not, at any time, tender the agreed-upon sum to increase its share in the partnership. BI's only efforts in this regard were its proposals to pay the partnership $600,000 in addition to amending the partnership agreement's buyout provisions. Vulcan was under no obligation to accept terms that altered the partnership agreement, and its refusal to accept the proposals could not be characterized as a breach of fiduciary duty. Thus, BI's allegation that Vulcan had attempted to "string them along" by rejecting BI's proposals in anticipation of the Dawson payment is unavailing. The assignment of error is overruled, and the judgment of the trial court is affirmed.
Judgment affirmed.
Winkler, P.J., and Gorman, J., concur.
[1] See State ex rel. Howard v. Ferreri, 70 Ohio St.3d 587,589, 1994-Ohio-130, 639 N.E.2d 1189.
[2] See Dresher v. Burt, 75 Ohio St.3d 280, 293,1996-Ohio-107, 662 N.E.2d 264.
[3] Jorg v. Cincinnati Black United Front,153 Ohio App.3d 258, 2003-Ohio-3668, 792 N.E.2d 781, at ¶ 6, jurisdictional motion overruled, 100 Ohio St.3d 1471, 2003 — Ohio-5772,798 N.E.2d 406.
[4] Brose v. Bartlemay (Apr. 16, 1997), 1st Dist. No. C-960423.